I think it's cool that you use your iPad so well. I think it's great that you use your iPad so well. You'll be fast. I'm going to cry. I'm going to try and make it up. May it please the Court, good morning. I'm here on behalf of the appellant Benefuel, Inc. And while this case involves some complicated transactions, resolution of the case we submit is actually pretty easy, based on very sound contract principles of interpretation. And this is a contract interpretation case. We're fighting over a contract between Benefuel and the Apple East Center Board, whereby Benefuel hired Center Board to find it new investors. In 2013, Benefuel was a startup biofuels company. It was pre-revenue. It was looking for more investors, more money. It didn't want to take on any debt because it didn't have any money coming in to repay the debt. And, of course, then you've got interest on top of that that you have to worry about it. So they wanted equity. They wanted people to buy stock in the company. And they hired Center Board for that purpose. Now, Benefuel already had some investors. The largest one at 20% being Koch Industries through its wholly-owned subsidiary FHR LLC or Flint Hills Resources LLC, in turn through its wholly-owned company FHR Renewables. Now, we certainly acknowledge that FHR Renewables is the precise entity that owned 20% of the stock in Benefuel. But I will refer to Koch slash FHR throughout my presentation. And I do that not to hide the fact that it was FHR Renewables that was the shareholder. I do that because that's how the parties themselves referred to Benefuel's primary backer, both during the negotiations leading up to the agreement and while the agreement was in place, both Benefuel and Center Board referred to Koch slash FHR as the primary investor. They even referred to Koch FHR as a shareholder. So those are the terms the parties used, and I'll do the same. Now, what this case is about is what fee is due, if any, to Center Board under this agreement. Center Board did earn and was paid what was essentially a retainer amount every month, and they did provide some advising services in some of the negotiations that took place. But they were wholly unsuccessful in bringing in any new investors to Benefuel. Despite being unsuccessful, Center Board sued Benefuel to recover the success fee under the agreement. And there are two primary contract terms at issue in this case. The first one is what do the parties mean by the term investment, and in turn we also need to look at the terms transaction and aggregate investment because both of those terms were defined by the use of the undefined term investment. So all three of those terms have to be looked at together. And then— I'm sorry, I can't hear that. Okay. It became closer. You can come closer. Would you like to come closer? I have a hearing aid, and this is an iPhone. If I turn it on, I can put it here, and I'll hear. Would that be all right? I don't have any concern about that. I think that would be fine as long as it doesn't cause some feedback or something. Is my clock stopped? If your time is to stop, we'll give you— No, no worries. And you've been running, so we'll give you another minute once you start again. But no, it should be stopped right now. And I'll try to talk louder as well. Okay. We'll all work together to get this done. Thank you. You bet. Cooperation, as they say on Sesame Street. Yes. And if you want to sit closer. You should be fine now. Okay. You're going to be okay now? Okay. Yes, sir. Okay. Good. I'm going to test it. Okay. I'm going to test it. Can you hear me? Yes. Okay. Good. Okay. Please give counsel another minute, please. So the first term is investment, and then the second term is what is meant by the term or the phrase current investor. And in my short time with you today, I certainly want to answer any questions the Court has about any aspect of the case, but I suspect I'm going to focus most of my time on the first issue, which is what do the parties mean by investment? And by that I mean this. Did investment include just purchases of Benefuel stock, in other words, equity, or did it also include loans of money made to Benefuel? So we have just equity, or did it include equity and debt? And our position is that it included just equity. And there were two deals that we have to look at that took place while this agreement was in effect. There was the mezzanine loan, which took place while the agreement was in place. A $32 million loan with warrants issued. The warrants represented a right to purchase Benefuel stock at a later date. Then at the end of the ‑‑ there was a tail period after the agreement was terminated for another year, and during that tail period towards the end of that, there was a convertible note. And that was ‑‑ by convertible note, I mean that the debt would convert to or could convert to equity, Benefuel stock, under certain circumstances, particularly if the note was not repaid. If the note was repaid, then it would never convert to stock. So both of these were hybrid deals that were primarily loans of money to Benefuel, but they had some equity component. But you begin by admitting they were hybrid deals. Yes. All right. Yes. They had an ‑‑ both of them had an equity component, no question about that. But it's undisputed that ‑‑ And you agree that equity equals investment? Yes. All right. So they were primarily loans with this equity component. The critical part, though, it's undisputed that under the mezzanine loan, none of the warrants were exercised during the term of the agreement or during the tail period. So there was no stock issued. There was a potential for stock issued if the warrant holders triggered it by paying their But that option was available. It was available, yes. All right. Under the convertible note, undisputed, that during the term of the agreement or the tail period, none of that debt was converted to stock. So, again, no equity was issued. No shares of stock were issued. And a convertible note might never be issued. And both of these loans, as I mentioned earlier, were made by Flint Hills Resources or FHR And that was a member of the Koch FHR family. And our position is that no success fee was due under the agreement because these two deals were primarily loans to the extent there was an equity component. No equity had been issued. And that the agreement was solely for equity and did not include loans. Now, two contract interpretation principles I ask you to keep in mind, and we're under You'll be familiar with them. First is, we have to look at the entire contract. Not just isolated words or phrases, but the entire contract. And secondly, it is a rule of construction in Delaware, as elsewhere, that if the same word or phrase is used in one part of the contract and that meaning is clear in that part of the contract, you have to use that term and interpret it consistently throughout the contract, wherever it is used. And here, we submit to you that the contract terms are unambiguous because you can discern the intent of the parties simply by looking at the contract language that they used. And now I'd ask you to turn to the demonstrative aid that I provided to the court. And this is not the chart, but it's the one, it's the two-page. And this comes from Defendant's Exhibit 13, which is the agreement at issue. And specifically, it's the compensation portion of the agreement at issue. Now, I retyped it word for word because it was difficult to read from the exhibit. I'll also point out that the red and the emphasis is, I added that. Have this? Yes. I do want to object. That was not an exhibit at trial. It's not part of the record of appeal. And I do object to everything in red. Yeah, this is new stuff you put up. Absolutely. The red in the margin is mine. And if you want to scratch it out, I'll just tell you what I mean by that. Just tell us what you mean. You bet. You bet. So there's a, in the compensation provision of the agreement, there's a work fee and a success fee. And then there's certain success fee exclusions, A, B, and C. If you look at the first provision, the work fee, they get $15,000, and this is kind of the retainer I was talking about, $15,000 in cash every month, no matter what. And they were paid that, and there's no dispute about that. If there is a successful transaction, they get paid an additional $15,000 per month upon the, due upon the successful completion of a transaction. So that's the trigger, a transaction. Well, what this tells us is because that success component of the work fee is payable in equity at the transaction price, that tells us that when the parties talk about a transaction, they are contemplating an equity transaction because only an equity transaction will result in a transaction price, the price for the shares of stock. There is no transaction price if transaction includes a loan of money. So this provision tells us that when the parties use the word transaction, they were contemplating an equity transaction. I'm going to skip B for a minute because that's the portion in dispute. If you look down in the second part of B, this is the provision dealing with current investors. If a current investor makes an additional investment into Benefuel, the 7% success fee is only going to be applied to that aggregate investment that increases their pro rata equity ownership. What does this tell us? It tells us that when the parties use the word aggregate investment, they contemplate that it is going to be an equity investment because only an equity investment could increase a current investor's pro rata equity ownership. A loan of money wouldn't increase anyone's pro rata equity ownership. And then the success fee exclusion paragraph C. But a loan of money would provide for the option to purchase these shares, wouldn't it? I'm sorry, now what? This option we talked about earlier? The warrants. Would a loan of money provide for that option to be exercised? Yes. In the mezzanine transaction, there were units that were sold. And so a lender, for every $100,000 that a lender agreed to loan, they got I think it was 3,000 warrants. And so it was a unit. They made a loan, and then with that loan they got the right to exercise warrants. But, again, none of those warrants had been exercised during the agreement, so there was no equity issue. So, and then paragraph C talks about certain exclusions. Again, contemplating consistent with the idea that a transaction is going to be an equity transaction. So then you go back and look at the success fee. This is the provision that's in dispute. They are claiming 7% of the aggregate investment, all of the money that was loaned in both mezzanine transaction and the convertible note. $32 million, $27 million of it was from FHR Treasury, and then $6 million was loaned in the convertible note. They're claiming 7% of that, and the district court awarded 7% of those sums. So 7% of any aggregate investment, and it says for purposes here of aggregate investment, means the total amount of all investments received in connection with a transaction. From the paragraph above, we know that when the parties used the word transaction, they were contemplating an equity transaction. Now, center board argues that these provisions are. Does a transaction have a price apart from equity? Could it have a price? I can't think of one. I can't think of one. It's talking about payable inequity at the transaction price. So the parties clearly were saying, center board, if you bring in new money, not only we're going to give you your success fee, but we're going to pay you in equity at the transaction price, whatever this new investor paid for their stock. Say they bought it at $5 a share, this new investor. Then center board would get an additional success work fee at that same price. That's all that means. There can be no other interpretation of that. Now, I'm running out of time. I want to talk just very, oh, wait, let me go back to center board's argument about this. So they say, well, ignore these other provisions because they're irrelevant. We're only fighting over the first part of paragraph B, which is the success fee. Well, I say no. You have to read all of the provisions in total, and you have to construe the terms consistently throughout. So in some of these provisions, we know that when the parties used the word transaction, they were contemplating an equity transaction. When the parties used the word aggregate investment, they were contemplating an equity investment. Therefore, when you get to the success fee, you have to construe that consistently. I want to speak very briefly about the district court's alternative argument that even if this term is ambiguous, the district court found that the party's subjective intent was to have investment broadly defined to include both equity and debt, and I submit to you that was an error as well. Two points I want to make there. Look at the negotiations leading up to the agreement, and look at industry custom. It is clear that the parties wanted very different things when they first began their negotiations. Benefuel wanted preferred stock. They wanted just equity. Center board wanted debt included. When Benefuel, here's the difference. So the parties were at odds, and they ended up not defining the term. Here's the significant part. When Benefuel said, no, delete the word debt, we don't want debt in there, they made it clear that they didn't want the word debt in the agreement because they didn't want debt. They didn't want the agreement to cover debt. They just wanted equity. But when center board said, let's delete the words preferred stock, center board gave Benefuel a neutral reason for deleting that phrase that had nothing to do with expanding the scope of the agreement to include debt. They reasoned that there might be another special purpose vehicle like they had done previously. It was an equity-like transaction, but it didn't involve preferred stock. And then second, industry custom, both expert witnesses for both parties testified that a 7% fee is consistent with an agreement for a company to go out and find new equity investors. If you hire a company to find lenders, the fee is going to be much, much smaller. So a 7% success fee in this agreement is consistent only with an agreement that it cover equity only and not debt. I'm out of time. Good morning. Alan Fellheimer, Fellheimer & Eichen, representing the Appellee Center Board. First of all, thank you so much for allowing me to do that. I could hear her. Okay. This is a contract that was heavily, heavily negotiated. At trial, we spent hours reviewing all of the steps of the negotiation. Yes, Benefuel came in asking for equity. Center Board said no. We don't know, looking at the company, looking at the situation, said no. We don't want to do it for just equity. The negotiations broke apart. They walked away from each other. They came back again. And in the end, they agreed to remove the words equity, prove any requirement of equity. Now, what Learned Counsel has tried to do is pick out certain sections and say, see, it says equity here, but it doesn't say there, so we can imply it in. This is a contract that uses words in certain paragraphs that it doesn't use in others. Yes, the work fee requires equity. That was a finding that Judge Fish made, and he ruled against Center Board on the work fee. And we didn't appeal that. One of his determinations was we weren't entitled to a work fee because there was no equity. And you can't have a work fee payable in the same price as the equity on the transaction, so there was no work fee. Again, the words equity do not appear in the success fee. There, the word is transaction. And every attempt that Benefuel made to limit that to equity was rejected in the negotiations, as was found by Judge Fish, leading up to it. And in the end, A, they agreed the transaction was both debt and equity, and more importantly, the internal e-mails, the internal communications between the two principals of this company made clear that they understood the transaction included debt. There was some confusion, and the president of the company resolved it and said, no, it includes equity. And that's an exhibit in this case, and it's an exhibit in the record before Your Honors. Transaction, under Delaware law, under the dictionary definitions, whether you go to Merriam-Webster or Oxford or even Blacks, all say that the word transaction includes debt and equity because it's any time you put up your money in the hopes of making a profit. Sometimes a profit's bigger, sometimes it's smaller, sometimes it's not at all. And some vehicles offer less risk, less profit. Some offer more risk, more profit, but they're all investments. And the debt, if I lend you money, I have put up my money in the hope of getting interest, i.e., getting a gain on my investment. And that's what the judge found in the definition of investment. It cannot mean equity only. Let me give you another example where they use different words. There's a provision in the agreement that says if you make, if an investment is made by any one of the following four people, I think it's four, or an affiliate of those, it says, and the word affiliate is used there. But then when you go down into the area where they talk about current investor, the word affiliate doesn't appear. So the parties knew how to use the word affiliate when they wanted to. But when they didn't want to, they didn't use it. What do you say to the argument that this appears to be some sort of apparent windfall? First of all, this is a contract, and the contract is pretty clear. And they did do work. They did a lot of work. They designed the mezzanine transaction. There's evidence, the judge noted that. There's evidence of a lot of work that they did. It's not a windfall. Investment bankers get paid on these kinds of contracts constantly and all the time. In all due respect, the expert for Benefuel said that they were entitled to the 7% fee, though he thought the 7% was high. Our expert, who is an experienced Wall Street person, said 7% is not high for a company such as this, where it's really iffy, where the cost of the Beatrice plant went from $45 million to $170 million, where they were getting diluted, and the facts have been diluted out now. This goes on all the time. Raising money for a company like that is very difficult. And that was the contract. They signed on for it. They wanted the service, and they signed it. Nobody held a gun to their head. It was heavily negotiated, and they agreed to it. That argument has to rewrite the contract. Right. So even though she says, well, they didn't raise any money at all. Well, that's not true either. First of all, there was an earlier transaction they were involved in with Sun of Canada, and they got paid for doing that, but also they didn't get paid on a current investor, which was Flinthill Resources Renewables, LLC. They've had two names, so it's a little confusing. The fact is the tail period, the whole setup of this contract is very standard on Wall Street, but it's what the parties negotiated and agreed to. This is not a bilateral contract. This wasn't like the bank sending you down a form saying sign it or you don't get our money. I have to tell you, my favorite ad lately is to see that where the guy eats a piece of pizza and says, that's my fee. I think that's the greatest ad I've seen in a long time for explaining to people what bank fees are. Yeah, this isn't that kind of a situation. This isn't we sent down the printed form off a LaserPro, sign it or you don't get your money.  After they thought they were done, Benefuel brought back in its own lawyers, brought in Ms. Block's firm. They tried to make some changes. Some of those were rejected. Anything that pushed it back to equity was rejected. In the end, it was signed and everybody understood it. To make certain everybody understood, look at what they said to each other in their private emails. They understood and included that. More importantly, when they went to the mezzanine transaction, they defined investment. How did they define it? Debt or equity on their own documents in the transaction. Your view is that the term current investor is an unambiguous term. And that a current investor is one who was an investor on the date of the agreement, which was December 1st of 2013. Yes, sir. And that any investor who invests subsequent to that date isn't deemed a current investor. Any different person who invests after the agreement is not a current investor. But there's a finite list of those who could be called current investors. Yes, sir. In your view. Yes, sir. Which to me seems to ignore the meaning of the word current. Why couldn't a current investor be anybody who currently invested? First of all, that argument wasn't made below. So I do want to make clear that that was waived. But your honor, if I want to say that somebody's an investor at the time they make the investment, not now, I would say then current investor, who was an investor at the time of a new investor or was a current investor at the time the second investment is made. But they didn't say that. They said current investor in this document at this date. Who's a current investor now? And that's why I gave you the chart. And this is an exhibit. This is an exhibit in the record. And that's in the appellate record. And that was an exhibit below that we have with the court. And you'll see it's fairly complex. But the bottom line of it is Flinthills Resources Renewables LLC was the investor. Now, Flinthills Resources Renewables LLC has very little relation to FHR Treasury 1 LLC. First of all, FHR Treasury 1 LLC did not exist when this agreement was made. It didn't exist. It wasn't formed until later. Second, the only person to testify on behalf of Flinthills Resources Renewables LLC, Mr. Bezdek, I went to, which taught to take his deposition. And I walked him through a list of everything I could find on Google, the words FHR or Flinthills. And there were a lot of them. And he told me, well, some of them he thought may have been companies, maybe not some others. But he went through. We got to Flinthills Resources. We got to FHR Treasury 1 LLC. He told us it was totally separate. Had separate management. He did not know what assets they had. Did not know how it was managed. Did not know where it got its money from. Didn't know if it had its own bank accounts. Didn't know pretty much anything about it. He said it's totally separate. But more importantly, more importantly, said it had to be separate. It's important to them that each of these entities be separate. For tax purposes, for liability purposes, for substantive consolidation purposes, for many purposes. And in fact, Benefuel's lawyers comment, in their record, Benefuel's lawyers sent an email saying, no, it's got to be separate. They can't have it together or you can have a substantive consolidation. They knew it had to be. They went to a lot of trouble to maintain all these separateness. And they're talking about something called Coke. I asked Mr. Bezdek, well, what's in all that? He said, well, somewhere between 5 and 20 companies. Each of which have, oh, 60 or so subsidiaries and subsidiaries and subsidiaries. Flinthill Resources Renewables LLC is a subsidiary of Flinthill Resources LLC. One of 60. FHR Treasury One LLC is a subsidiary of another company which he couldn't tell me who owns what or where it went to. Delaware law honors corporate separateness beyond almost anything. To pierce that corporate veil, you have to show an awful lot. And there's been no showing of anything to pierce the corporate veil. The current investor at the time this was done, the disagreement was made, was Flinthill Resources Renewables LLC. FHR Treasury didn't even exist. So that when they made the investment in December of debt and equity in the hybrid transaction, they were new. They didn't exist at the time the agreement was made. They were not a current investor. The argument that they might have been a current investor when they made the second investment, first of all, wasn't raised below. But second of all, I don't think that's what the contract says. The contract doesn't say at the time of the investment. One thing about those warrants I'd like to make a comment about. These were penny warrants which are automatically exercised at the end of the term. So if you do nothing, the warrants automatically exercise. And they only cost a penny apiece. What that means is as a practical matter, it's a little like, well, it enables you without an investment. Let's assume the company is doing well and the stock's going up. Think Apple. Yeah, up, although it's going down lately. Up. It enables you, the investor who put up the debt and has the warrant, to take the benefit of the gain because your warrant is continually more valuable as the stock price goes up without ever having to put up any money. And when you finally get to, so let's say it's a dollar when you start and it's five dollars when you finish. You now have a four dollar gain. All you have to do is pay your penny. And just in case you forget to exercise or you don't do anything, at the end of the term it's an automatic exercise and you get the stock and net of your penny for whatever it's going up to. It's a mechanism to enable it, to give a debt holder an additive incentive to share in the gains of the company without having to put up any more money. And the money you ultimately put up is extremely nominal, one cent per share. Now, I think that Benefuel confuses inapplicability of various clauses with meaningless. Yes, the work fee is not triggered if there's not an equity transaction. That's what the judge found and that's reasonable. But the success fee is not triggered by a current investor. In other words, if a non-current investor such as FHR, Treasury One, LLC, makes an investment in debt, the equity language that replies to current investors doesn't apply. And for a non-current investor there is absolutely no equity language that's applicable for a non-current investor. Am I clear? Okay. The cash portion of the work fee is not tied to any particular transaction, equity or debt. And again, the success fee is due upon receipt of the cash proceeds without regard to whether it's debt or equity except in the case of a current investor. There is a provision that says if a current investor invests then it has to raise their equity and you only get a fee to the extent of the additional equity that they raised, their percentage went up, and the percentage you get goes from 7 to 5. But that's only for a current investor and FHR, Treasury One was not a current investor. It was a new investor. It didn't exist at the time as a new investor. So the word equity appears in certain places and doesn't in others. Just like the word affiliate appears in the clause in the contract that says if you get an investment from this one or that one or they're affiliates, your fee is reduced. They didn't use the word affiliates in the provision with respect to current investor. It didn't say current investor or its affiliate. If the word affiliate had been there, then we'd have to take a different hard look at who are these people and who are they related to and are they affiliates, which I'm not sure they are. But to have some amorphous term that's anybody in this group of somewhere between 50 and 20 parents with 60 or more subs each becomes a universe you can't even define. The word Coke was used early in the investment process, and the reason it was used is the company had prepared investment materials, memoranda, books, PowerPoint presentations, pitch books we call them. And the Senate would use those pitch books, and those pitch books had that word Coke in it. But as soon as anybody got interested, they brought them down. They said, this is the investor, Flint Hill Resources Renewables LLC. It had a prior name to FHR Renewables. But it was made extremely clear to everybody who looked at this company, of the hundreds of people that the Senate board introduced to this investment, who the investor was. And it wasn't Coke. It was Flint Hill Resources Renewables LLC. Judge Fish went further, by the way, than just dictionary definitions for investment and transaction. He also looked at the evidence. He looked at the, because we had three days of trial of evidence, three long days, four long days of evidentiary hearing trial. And he looked at the evidence, and he looked at what took place and said, no, this was heavily negotiated, heavily back and forth and back and forth. And yes, the word equity is used in certain provisions, but not in others. And it's not used in connection with the Berk fee, in connection with the non-current investor. And the word current investor can only mean a current investor at the time of the contract. Otherwise, it would have said current investor at the time of the investment. I think Judge Fish understood it, and I ask you to affirm the decision. Thank you. We have your argument. You just have time for rebuttal, counsel. You need to put your phone thing up there, and you need to give her back her full time, please, and we'll start when he gets his phone up there. Thank you. Appreciate your help. Yes, sir. It's got to boot up. We'll wait for it to boot up for a second. No worries. I understand the lawyer's instinct to turn off your phone in the courtroom. That's a good instinct. I've checked mine about 12 times. When it starts ringing from back there, it's not good. Testing. Are we good? All right, I'm going to jump into it. Mr. Feldheimer talked a lot about the dictionary definition of investment, and under Delaware law, you don't resort to dictionaries unless the meaning is unclear. And we submit again, it is clear from the context of the language that the parties used what their intent was. And you have to look at those three terms together, transaction, investment, and aggregate investment. And from that compensation, the entire section of the agreement, it's clear that the parties contemplated an equity investment would give them the success fee and not any debt. Mr. Feldheimer also pointed out to another corporate document in the record, not the agreement that's at issue in this case, that has an expansive and a very expansive definition of investment. And I think you can find that at Plaintiff's Exhibit 127. I believe it's also in Plaintiff's Exhibit 101. It is an expansive definition of the term investment. It goes on for probably a hundred words. It's got, I think, seven different components. It includes debt, loans, mergers, acquisition of more than 50% of the capital stock, different kinds of transactions. What that tells us is when the parties wanted an expansive definition of investment, they knew how to do that, but they didn't do it here. So you have to read it in context. I want to talk briefly about current investor because there was a lot of discussion about that. And I think the thing that tells us most about what the parties intended by that term is how they operated while the contract was in place. How they operated was that center boards, primary representative who was the boots on the ground doing this work for Benefuel, trying to go out and find new investors, used the term Koch FHR, referred to Koch FHR as a current investor in Benefuel. Many, many examples in the brief. I'll just point out to a few of them. Again, this agreement was in place during, basically during the calendar year of 2014, early in the year where Mr. Singer is trying to entice investors. Defendant's Exhibit 30, he refers to Koch owning a majority of the company. Defendant's Exhibit 43, in June, Mr. Singer describes a partnership between Benefuel and Koch FHR. Defendant's Exhibit 59, this is in August, he refers to Benefuel as a company jointly owned by Koch Industries. He refers, in Defendant's Exhibit 62 and others, he refers to Koch as an existing shareholder. So how the parties operated while the agreement is in place tells us the most about what they intended by the term. The parties, both parties, knew and understood that current investor was going to include the Koch family, the FHR family, and step back. Why didn't they add affiliates in that section when they added affiliates in other sections? As our representative, Mr. Riley, testified at trial, they didn't include affiliates because everyone knew who they meant. They didn't need to. They did that in other sections. They did that in other sections where they specifically identified specific corporate entities and then also wanted to clarify, oh, and by the way, also their affiliates. But when they used the term current investors, the parties understood, both understood, had a common understanding of that. Step back or step up 30,000 feet. What is this agreement about? It's about hiring center board to bring new money, new decision makers, new people to the table. The people that Benefuel dealt with in negotiating the mezzanine transaction and the convertible note were the exact same people, the same decision makers, that had already participated in Benefuel. They were already the existing shareholders. Counsel, you need to wrap it up. Look at the contract. Center board did get a windfall. They got a $2.3 million windfall. We ask that you reverse the decision below, interpret the contract consistent with the clear intent of the parties and reverse the decision below. Thank you. Thank you. This concludes the arguments for today.